Good morning, your honors. My name is Lisa Cantor and I'm honored to be here this morning on behalf of Anna Martinez. This is an ERISA case which raises the question of whether an ERISA plan should be allowed to refuse to pay any benefits on behalf of the beneficiary based on a coordination of benefits provision. The beneficiary in question is Steve Martinez who is in a persistent vegetative state and the plan has not paid a single claim related to this persistent vegetative state since the inception of the plan on January 1, 2008. The plan contends and the district court agreed that Medi-Cal had to pay any claims related to this injury as primary, the Special Needs Trust had to pay next, and the plan was allowed to be the payer of last resort, paying only when and if the Special Needs Trust was exhausted. This order of payment is contrary to the plan language, the law, the facts, and simple logic. After two lawsuits and a moving target of bases for this refusal, the only relevant plan language is a single subsection of the coordination of other sources of payment section of the plan known as Section A.11.3 entitled Effect on Benefits, which reads, Benefits available from this plan shall always be considered only after reimbursement of the expenses from any other source for which benefits would normally be provided for under this plan. The other source upon which the plan relies is the Special Needs Trust. After Steve suffered his traumatic injury at an LAUSD school in April 2005, a jury returned a verdict in April 2007 in favor of Steve. The case was then settled and a settlement was approved by the Los Angeles Superior Court in June 2007. The plan's position is that the jury found LAUSD liable for Steve's injuries and all of Steve's medical needs related to his persistent vegetative state was prepaid with the funding of the Special Needs Trust, and that, therefore, the plan is not required to pay those benefits until after the trust is depleted. As a matter of fact, however, the plan is wrong. First, the creation of the Special Needs Trust followed the April 2007 jury verdict, which awarded Steve a total of $7.6 million, including $3.7 million in medical, nursing, hospital, attendant care equipment and supply needs, $775,000 in lost earnings, and $3.15 million in past and future pain and suffering. But following the verdict, a settlement was reached in which LAUSD paid only $6.4 million to Steve, of which $3.4 million was paid in attorney's fees and costs. Of the remaining $3 million, the trust was funded with only $1 million, and an annuity was purchased, which pays $14 million a month into the trust. Thus, the fundamental premise upon which the district court and the plan based the conclusion that the Special Needs Trust was a source for which benefits would normally be provided for under the plan was simply not true, because the conclusion that the trust contained advanced reimbursement for Steve's medical needs was not true. For example, in the first trial, the district court said in May 2007, shortly after trial, the parties agreed on a $7 million structural settlement, of which $3.6 million, the exact amount the jury found to properly account for future medical needs, was placed in the Special Needs Trust to provide for Steve's future health and welfare. This is on ER 24. That's not an accurate statement. And in the second trial, the district court stated that only $1 million was placed in the Special Needs Trust, and then a $2 million annuity was bought, of which only $14,000 is being put in the Special Needs Trust each month. I think you misspoke. You said $14 million before. I'm sorry, $14,000. $14,000. $14,000 is being placed in the Special Needs Trust each month. The same statement was said in the second decision of the district court. $3.6 million was placed in the Special Needs Trust to provide for Steve's future health. At ER 3.4 and ER 11, the district court said the settlement with LAUSD reimbursed in advance the anticipated cost of Steve's care. This just didn't happen. And so by no stretch of interpretation of the plan language can we say that the Special Needs Trust was a source for which benefits would normally be paid for Steve's needs. So that's the problem with the interpretation of that language. The anticipated cost of Steve's care, according to the jury, was $3.7 million. And even if we add up all the money that's been put in the trust to date, it doesn't even add up to $3.7 million. So what the plan is actually doing is coordinating with a portion of the money that's been given to Steve for all of his damages, not only health care. So when was the first claim put in to the Beverly Hills ERISA? January of 2008. That was the first time. Why was not a claim put in prior to that? Prior to that time, the plan, the coverage was with Blue Cross. And it was, according to the district court, a different plan. Blue Cross was paying for Steve's persistent vegetative state. And it did have the right to a lien. And the only evidence that we have is that the plan administrator told Blue Cross to put a lien in to participate in the superior court proceedings. And they screwed up, according to the plan administrator. So this 2008 policy or ERISA plan that you're just debating about now, you first, it came into effect as a new plan and you made your first claim in 2008? Correct. Okay. So we only look at that plan. Correct, because this is the only plan that has an issue with paying for the persistent vegetative state. Prior to that time, there was no problem. And what it's trying to do is reach back and not pay for any claims. And it hasn't paid for any claims since that time. So in effect, what's happened is Medi-Cal is paying for Steve's claims. As I understand, so Medi-Cal, if there's a private insurance paying ERISA plan that's required to pay and is paying, then you, Steve, would not have recourse to Medi-Cal or Medicaid. Medi-Cal is always the payer of last resort, according to the law and according to the plan language. So by the very language of the special needs trust, it doesn't seem to be a source, another source in any way for paying for his health needs until the public funding runs out. I'm trying to find the special needs plan, but okay, yeah. The intent and purpose of this trust is to provide a discretionary spendthrift trust to supplement public resources and benefits when such resources and benefits are unavailable or insufficient. That seems to assume that it doesn't step in to cover when a private insurance company or ERISA plan would cover, so that the application of A11.3 is wrong. Correct. Our position is that the special needs trust pays second to Medi-Cal, so the plan can't pay. It can't use that provision of its plan as a basis for denying coverage to Steve. That's our position. The district court said it could use that provision to make pay last after Medi-Cal. So originally the plan did cite that 1.11.3 as a reason, and then it withdrew it, and then it gave the two other reasons that are invalid according to the district court, and not that reason in the final letter, right? Correct. Do we have anything in the record that explains why that basis was withdrawn by the insurance company? We have nothing in the record, Your Honor, and our position is that at that point they should have been ordered to pay. Didn't they say it was an advertence or kind of a mistake or something? Well, we went back on remand, and then we filed a second lawsuit, and on the second lawsuit the benefits claim was actually stayed. You're supposed to go to trial on the two DECA relief causes of action, which were future benefits, and then a new reason they gave for denying, which was that they had retroactively amended the plan back to January 2008 to limit home health care to only $10,000 a year. They offered that reason in the second letter on remand. But instead of having a trial on only those two causes of action, the district court actually tried all three, so we never really tried the first cause of action. He accepted their statement that they inadvertently left out A11-3 from their April denial level first time and meant to put it in the second time. The problem with that is that we had trial days of the first trial, and the plan administrator was on the stand two days and testified at length as to her participation in the preparation of the July denial letter and how she participated in ten conversations and one face-to-face meeting and reviewed the plan and put all this time and effort into it, and at no time did they offer any testimony that there was some kind of inadvertence or mistake in that July letter. It was only after the district court's first decision where he dropped that footnote saying, I'm not going to address A11-3, and it may be a basis for denial that all of a sudden on remand it became an inadvertent mistake in the final denial letter and the reason for denial on remand. If there are no other questions, let me reserve the rest of my time. Thank you very much, Mr. Chairman. Good morning. May it please the court. Good morning, counsel. I'm Scott Shepard. I'm here on behalf of the defendants and respondent plan. I would start with saying that our brief, I believe, is comprehensive. I think it addresses all of the concerns and questions that I've already heard from this panel. I think it addresses them thoroughly and correctly. The brief proceeds chronologically, and unless the court has specific inquiries as we go along, I intend to just address a couple of things that at least struck me as important to point out. I wanted to, in my comments, address the merits of the A11.3, the standard of review issue. Doesn't Harlech preclude you from coming up with a new reason? It wasn't in the final demand letter. It absolutely does not. There are two reasons why it does not. The first thing is Harlech on its facts is incredibly distinguishable. Harlech is a case where throughout the course, the trust in that case continued to deny things because it was a residential facility. Only after oral argument and the trust at that point finding out that the, I forget the name of the law, was going to require that they find that medically necessary expenses had to be reversed, did they say, Aha, we want an opportunity to challenge the medical reimbursement issue, we manned it. Well, they had actually said, the trust had said, both to the plaintiff and the plaintiff's mother, and separately to the Department of Mental, I don't remember, but to that department, said to each of them that medical necessity was not an issue. So Harlech doesn't apply on that basis. That's one. That's the legal basis Harlech doesn't apply. Second, factually, Harlech doesn't apply here. A11.3 was identified in the administrative denial on April 2008. Then when we get to July. Then it was withdrawn. It was not withdrawn. I disagree with that statement. It was not in there, was it? Factually, was it in there or not? Was it named in the letter? Was it named? No, but neither was A11.1. Neither was A11.1. In the July 2008 letter, you look and the language is A11. It says coordination with other sources of payment. There are two things that I think are very important about that letter. I have notes on them, so if you'll just give me a second. But the first thing is the language, when you lay A11.1 and A11.3 side by side, you see significant parallels in language. It was not raised by counsel, Ms. Martinez or anyone, that the quotation in that letter in July dated June erroneously. Another inadvertent mistake. It's dated June. It just shows that your administrator is incompetent with all these inadvertent mistakes. It shows the administrator made mistakes. But that doesn't mean that when you give certain reasons in your final denial, that you can come back and those reasons fail, that you can come back and come up with new ones. And in public, it's not distinguishable because in this case, the district court judge did put in, oh, well, there's this other reason, and so you had a whole hearing on your reasons, and the district court judge said, nope, they don't hold water, and drops a footnote and says, but you might want to consider this one. Because he realized that it had been raised in April 2008, and in the July letter, you see it's an actual ‑‑ I don't think he did. I can't know why he put it in there, but he put it in there. Okay. And I think he had the same thing when he looked at the quotation and realized, one of his clerks perhaps, maybe him, realized that the quotation actually had been lifted, not from A11.3, which had been excerpted in April, but from A11.1, and said, I can't make the assumption that that was inadvertent. I've got to give the plan the chance to do it again. And let me ‑‑ it's important that I do this. The same sections, the subrogation and reimbursement, were raised in April and July. The only difference is in April it says A11.3. In July it just says A11. And then there's a quote. And unless you go word by word with that quote and compare it to the plan, you don't even see that it's from A11, not the A11.3. And it says here, there was another party who was determined to be responsible for charges which resulting from Steve's injury illness. Factually, that's consistent. And the very next phrase says, the plan upholds their denial of eligibility for benefits. That clearly shows that they're channeling what had already been said. We're upholding our denial. It channels what had happened in April. There's consistency throughout this thing. Well, they want to make it consistent. Isn't that right? I'm sorry? They want it to be ‑‑ to sound consistent. They absolutely need to be consistent. In the first time, Janet Jacobs, who was acting as the plan administrator, did not consult with counsel. She had the assistance of counsel, which this Court has noted is an important factor when weighing things like conflicts. This is not the plan coordinating with Medi-Cal. It's not the plan coordinating with the Special Needs Trust. Those are both factually inaccurate. The district court made factual findings relevant to those things. Those are reviewed for clear air. And when we get to the money, what we have is really simple. $3.6 million was awarded by judgment for future medical care for Steve. And Ms. Martinez, in a cooperative contractual deal with the defendant, negotiated a settlement that took $1,016,000 and put it directly in cash into the Special Needs Trust. Took $2 million and paid for an annuity that provided $13,000 in change a month, increasing every year by 3% for the minimum of 10 years or Steve's life. So $2 million. That's $3 million in change. And she also worked out a compromise that she and her husband got $600,000. And they also worked out that the trial court, the Superior Court, in the LAUSD lawsuit, that they would get $4,000 a month for taking care of Steve from the Special Needs Trust. The Special Needs Trust is a repository. It is a warehouse. The other source was the LA Unified School District. It paid money for Steve's future care. And now they're in here and they want to recover twice. And that's not proper. Let me ask you this. Let me ask you about the first ruling the district judge made, the one March 9, 2010. Yes, sir. He gave his reasons for why the plan improperly denied the claim. He did. If he was right about that, I take it you don't think he was right, but if he was right about that, I don't understand why he would send it back to give them another chance at it. I don't understand why that just isn't the end of it. Because as he found factually, when he looks at the DR-478, the July 2008 letter, and he reads this language and he identifies, it's not in any of the briefing for the trial court, he identifies that was lifted from the other section of the plan. And then I look at the plan and I look at those two sections and I lay them close together and I see that it's really easy, frankly, to make a mistake between those two. But he looks at it and he says the quote is A11.1. I cannot assume, because again, you're right, I'm assuming this, but I think he looks at it and says I can't conclude that the plan in July intended to say A11.3. I have to wait to see what it does. That's not the district court's job, though. The district court is not supposed to make the plan's case for it and say, oh, but I can see you have another way. That's your job. Your plan administrator needs to put in the reasons for the denial. And that's it. And there shouldn't be any demand after that. I would actually flip it, Your Honor. I would flip that. Here's how I would flip that. Because it's clear that the plan throughout intended to use the factual basis, the idea that the LA Unified School District had recovered. And they tried to state it and they made an inadvertent mistake. And now plaintiff wants to say, aha, gotcha, I'm going to let you take an inadvertent mistake, an error. You go from one month to the next and you suddenly excerpt the wrong letter. And I want to turn that into a double recovery for my medical injuries. That's what this is. But is this an amount of money that you deal with inadvertently? No, I don't think. So the way that the testimony came out is that Janet Jacobs communicated and had Julie Wolstein write the letter for her. And I just suspect. Well, then you're going behind what they would like to do away with. Well, so we know from the first decision that the judge said, there are two things, that the judge said A11 may not be, may be a good reason, but I'm not going to plead justice. Second, he remanded it. The idea of being able to come in on this judgment and seek to appeal that remand decision is wrong. That choice was waived by plaintiff. That decision could have been waived. She could have appealed the remand and said, you can't just remand and send it back. You have to order him to pay. So you mean she could have filed a notice of appeal from that order? Yes, she could have. My research indicates she couldn't. I disagree with that. I'll tell you why. I don't, I think that when, it's like if you get a plaintiff who goes in recovering damages and they get a nominal damage award of a million, of a dollar, and they think they should get more. They can go appeal that decision saying. It's a final judgment. That's not a remand. That's not a remand. Okay. That's true. A remand is an interlocutory order. A final judgment of amount of money is a final order. Well, I think, no, I don't, I think this was a final judgment that said that there were procedural irregularities that required to go back, and he remanded it back to the plaintiff to do it right the first time. But then, but that was not a final order. Sure it was. It was, of course, a final order. It was treated as one. She brought a motion for attorney's fees. She said it was a final judgment. It is a final judgment. Who is she? Hensley doesn't change this at all. What about Banuelos versus construction labor's trust funds? I don't have that case in mind, Your Honor. I'm reading my note here. An order remanding a case to an ERISA plan administrator is appealable only when the district court order conclusively resolves a separate issue and forces the agency to apply and so forth. Review would be foreclosed if an immediate bill were not available. So it looks to me like you're out, that they had every right to wait until this was completely finished before appealing. So here's what I think. Let's not get hung up on that. Let's assume, I mean, here we are. Let's assume they had the right to wait, and now it's in front of us. Then what? Okay. So then we're back to the issue of whether the remand was appropriate, and I think that it was. Why did they get another chance? Why did they get another chance to fix what they did? I don't get that. Because they had identified A11.3 all the way through. You get to one place where in the final decision it doesn't show up. But there's no bad faith. No, but these are technical things. It's like a statute of limitations. If you miss it by a day, you're out. You know, if they have to list everything that justifies their reason and they leave out one, well, that's their tough luck. I don't think that kind of technicality would be consistent with Supreme Court jurisprudence on this. I mean, the cases from this circuit are complicated. What Supreme Court case says that they could send it back like this? I don't have a case. I didn't think you did. The Supreme Court jurisprudence said, what were you referring to? Just my sense of reading all the cases, and I don't have one, but I have a feeling. I just have a sense. Like, ERISA isn't about trickery. It's not about plaintiffs coming up and trying to say, oh, there you left it out of one letter even though I knew you meant it, the judge knew you meant it, we sent it all the way through. Just a moment. They're the ones who wrote the letter. Yes, they are. And what you're saying is that the court should, after the fact, take the view that they were just careless. Yes. In fact, that's, in fact, why the judge sent it back the first time. I understand you have any case in which a judgment was remanded because it was based on a letter that was disclaimed after the judgment. This district court judge, I think, very well went through the Harlett case, and I think that the distinguishing factors that I point out make it clear. In that case, it was about sandbagging. There's nothing about what the plan did here that tried to sandbag. Plaintiff at all times had noticed through the information exchanges of what the plan was trying to do. She knew that the corpus of money that was recovered by, from the L.A. Unified School District, through that judgment, was the basis for which we hadn't any other source provision that was being invoked. It wasn't news to her. It wasn't trickery. It wasn't deceit. It wasn't ah-ha. It wasn't post-moral argument. All right, all right, all right. Even if you're right in points one and two, I have trouble seeing that A11.3 absolves you of coverage in this case. First of all, it talks about reimbursement of the expenses for which benefits would normally be provided. The special needs trust doesn't necessarily, isn't for reimbursement of expenses. It says the trust advisory committee shall have the power and discretion to recommend and advise the trustee concerning payments to be made to or for the benefit of the beneficiary. Second, it doesn't just cover medical expenses. It covers special equipment, programs of training, education. I think it means rehabilitation and travel needs, recreation. It's far beyond what your policy was intended to provide. And third, as I said before, it's intended to, I'm sure you have some limits, and then after that the public resources would kick in. And when those resources are out, we're talking about a kid who's paralyzed for the rest of his life. When those resources are at their limits, or who knows what's going to happen with those resources, that's when this trust kicks in, all by its own terms. So I don't see how it fits within your A11.3. It's the wrong focus, Your Honor. The S&T is, it might as well just be a bank account. First of all, in order to protect availability for public assistance with Medi-Cal, it's working. Medi-Cal has paid over 97% of Mr. Martinez's special needs. Because you haven't been covering his, you haven't been paying his medical expenses under your policy. The after reimbursement of the expenses from any other source has been interpreted by the plan, by the way it has discretion to do so, and its discretion must be upheld unless it is illogical. But we have to view your determinations with a high degree of skepticism under a body because you have a clear conflict of interest. Well, so no, when we get to a conflict of interest that is only structural, and by the time the second trial came around, the procedural irregularities had been cured, leaving only the structural conflict. And we know from, I think it's MetLife, that a structural conflict alone can reduce to the vanishing point if the administrator does things to resolve the conflict, like consulting with outside counsel. So we've seen that before. So we really have just a structural conflict that at most should warrant a minimal amount of skepticism, but this judge clearly used the right standard, applied the right standard, went through it, and exercised deference. He identifies in his own order that he had gone through it. He had two days of trial with live testimony, witnesses, a declaration, and he made the right finding. It was moderate degree of skepticism, and that was because there were some procedural irregularities, but there was a timely and good faith exchange of information, a full and fair review of successive supplemental submissions, thorough written explanation. There was no malice, no self-dealing, no parsimonious claims handling. What does no self-dealing mean? Why wasn't it self-dealing? Why wasn't it self-dealing? Because there was nothing about denying it that gave Janet Jacobs any benefit. She was the plan administrator, and the judge made a specific finding that her financial incentive would be so remote as to be practically nonexistent. He made that finding before or after the remand? Before. Before the remand. How did it come up? We had a trial where we came in to have a discussion about whether the ‑‑ what level of skepticism should be applied given that there was inherent structural conflict of interest. And all of the cases tell us that ‑‑ And that was a bench trial or a jury trial? Yes. It was December of 2009. And we were in front of the judge, and we had submitted declarations. This was the second trial, but it was not ‑‑ It was the first trial. So the first trial was a day to just talk about the right standard of review. And he found that it was truly an abuse of discretion standard. And then we went to the second day of trial, and there was testimony of three witnesses through cross‑examination and redirect. And we looked into what level of skepticism should be applied. And the judge said moderate skepticism because there were widespread but technical irregularities, but there were no wholesale flagrant procedural violations, no bad faith, and no prejudice to plaintiff's substantive rights. And we cured the procedural irregularities so that we are left when we get to the second trial with absolutely nothing but a pure structural conflict that the judge had already found had really no impact whatsoever. It was a vanishing point. Let me just think this through. I'm just trying to unpack how we would resolve this. The first issue would be whether they can even be here, whether they can file a notice of appeal or if they've waived it, right? As to the issues from the first trial, that's correct. Right. If we were to agree with you, that's the end of it. Yes, sir. If we agree with her that she has the right to wait until the whole case is over, we're off and running. As to the remand issue. Yes. Then the second issue is should the judge have remanded the case back to the plan administrator back in 2010 or whether he should have just said your reasons were wrong, paid the benefits. Right? That's the next issue. If that's not waived, I think that's what's waived. I think that's what should have been appealed. Yeah, but I just said, assuming we disagree with that.  Yes, then that's the next issue. Okay. Is there a waiver? And if we say there is no waiver and that the judge shouldn't have sent it back, he should have just said your reasons, the judge was correct, plan administrator, you were wrong denying the claim, your other mistake was, or your mistake was sending it back to give them another chance at it. Just pay benefit. That's the end of that, too, right? Yes. And then there's the attorney's fees issue. Yes. And then we'd have to reverse that as well because he assumed that, I guess, if he ordered benefits, you would reverse the attorney's fees, but I don't think that's the right decision. Have I left out any issue in the way we ought to approach this? I think that it has to go with the first issue about remand, I guess, whether they got to apply A11.3. And the next issue is if they get to apply, if they're not barred jurisdictionally, was A11.3 factually waived? And then the next issue from there is did A11.3 apply? Could it be invoked within the plan's discretion to deny the benefits? And then the fourth thing is on the attorney's fees, which goes back to the first trial, was the district court within its discretion in finding that there had been no success on the merits to qualify the threshold? Even if that decision is made, then it would probably have to go back to the judge to apply the Hummel fact. Right. Thank you very much. Thank you. Thank you. Mr. Shepherd, thank you very much. Ms. Cantor, you've got a few minutes left. Thank you, Your Honors. I just want to address the issue of the decision tree. I think the decision to remand was wrong. I just want to make clear that if there's going to be an order on the case that we get some finality, I don't want to get another decision by this plan administrator with a new decision, a new reason to deny benefits. And as I mentioned before, there was a new reason brought up on remand. I think the discussion on Harlech is appropriate. We need some finality, and the decision to remand originally was wrong.  I think our plan administrator should have given us all the reasons in that one letter. And I think that one letter is what should have been decided on in December of 2009. Thank you. Thank you, counsel. Thank you, Ms. Cantor.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you to the case just argued as submitted. Good morning.
judges: Cedarbaum, Silverman, Wardlaw